# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

CITY OF REVERE, MASSACHUSETTS, individually and on behalf of a class of all others similarly situated,

Plaintiff,

v.

3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); EIDP, INC.; DUPONT DE NEMOURS, INC.; CHEMOURS COMPANY; CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; ELEVATE TEXTILES, INC.; GENTEX CORPORATION; GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.; FIREDEX GW, LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; INTERTECH GROUP, INC.; LION GROUP, INC.; MILLIKEN & COMPANY; MORNING PRIDE MANUFACTURING L.L.C.; PBI PERFORMANCE PRODUCTS, INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; STEDFAST USA, INC.; and SOUTHERN MILLS INC. D/B/A TENCATE PROTECTIVE FABRICS,

Defendants.

Case No.:0:26-cv-4539

**CLASS ACTION COMPLAINT**

**(Demand For Jury Trial)**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff City of Revere, Massachusetts, individually and on behalf of a class of all others similarly situated, brings this actions against Defendants 3M Company (f/k/a Minnesota Mining And Manufacturing Company); EIDP, Inc.; Dupont de Nemours, Inc.; Chemours Company; Chemours Company FC, LLC; Corteva, Inc.; Elevate Textiles, Inc.; Gentex Corporation; Globe Manufacturing Company, LLC; W.L. Gore & Associates, Inc.; Fire-Dex GW, LLC; Honeywell Safety Products USA, Inc.; InterTech Group, Inc.; Lion Group, Inc.; Milliken & Company; Morning Pride Manufacturing L.L.C.; PBI Performance Products, Inc.; Safety Components Fabric Technologies, Inc.; StedFast USA, Inc.; and Southern Mills Inc. d/b/a TenCate Protective Fabrics (collectively, "Defendants"). Plaintiffs' allegations are based upon the investigation of Plaintiff's counsel, upon information and belief, and upon Plaintiff's personal knowledge.

## I. SUMMARY OF ACTION

1. This putative class action challenges an unlawful scheme by major chemical manufacturers and firefighting equipment companies to sell firefighter protective gear containing toxic per- and polyfluoroalkyl substances ("PFAS") while concealing the associated health risks.

2. In the City of Revere, as in every other fire department in the country, brave men and women are called upon to provide services to protect the lives and property of all persons, businesses, and public or private entities in their municipality or its environs. The City of Revere fire department is one of approximately 29,452 fire departments around the country that employ a total of approximately 1,041,200 firefighters, of which

approximately 364,300 are career or professionals and approximately 676,900 are volunteer firefighters.[1]

3. In order to allow their firefighting personnel to safely and efficiently perform their duties, Plaintiff and class members purchased certain clothing or wearable items marketed to be worn by firefighting personnel in their line of duty including jackets, pants, footwear, gloves, hoods, helmets, and respiratory equipment. This firefighting clothing and these wearable items are commonly referred to in the marketplace as "firefighting personal protective equipment" or "firefighting personal protective turnout gear" ("Turnout Gear").

4. Because firefighting Turnout Gear requires a thorough cleaning after use, in accordance with industry standards and to assure the availability of a clean set at the time of need, Plaintiff and Class members provide each firefighter they employ with at least two sets of Turnout Gear.

5. Defendants manufactured, put in the stream of commerce, distributed, marketed, and sold to Plaintiff and class members Turnout Gear that was treated or contaminated with PFAS.

6. PFAS are a class of persistent chemicals, including highly toxic compounds that are known to impair immune function and increase the risk of cancer, and have posed and continue to pose a substantial risk of injury to the health and safety of the firefighters

[1] U.S. Fire Department Profile Report, National Fire Protection Association Census (2022).

and others exposed to the chemicals through their use, cleaning, and storage of Turnout Gear.[2]

7. Studies have shown that firefighters contract cancer and other serious diseases at much higher rates than the normal population. According to a study conducted by the International Association of Fire Fighters ("IAFF"), 72% of IAFF member line-of-duty deaths in 2023 were due to occupational cancer.[3]

8. Defendants 3M Company (f/k/a Minnesota Mining And Manufacturing Company); EIDP, Inc.; Dupont de Nemours, Inc.; Chemours Company; Chemours Company FC, LLC; Corteva, Inc.; Elevate Textiles, Inc.; Gentex Corporation; Globe Manufacturing Company, LLC; W.L. Gore & Associates, Inc.; Fire-Dex GW, LLC; Honeywell Safety Products USA, Inc.; InterTech Group, Inc.; Lion Group, Inc.; Milliken & Company; Morning Pride Manufacturing L.L.C.; PBI Performance Products, Inc.;

---

[2] Monograph Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate, NATIONAL TOXICOLOGY PROGRAM, Dept. Of Health & Human Services (2016); Nur-Us-Shafa Mazumder, et al., "Firefighters' exposure to per- and polyfluoroalkyl substances (PFAS) as an occupational hazard: A review," Front Matter 2023;10: doi10.3389/fmats.2023.1143411 (Author manuscript at PMC 2023 Dec. 06.); Rocio Aranda-Rodriguez, et al., "PFAS emissions from functional textiles using micro-chamber and thermal desorption coupled to two-dimensional gas chromatography-time of flight mass spectrometry" (TD-GCÅ~GC-TOF MS) Journal of Chromatography A 1733 (2024) 465219, Judith M. Graber, et al., "Prevalence and predictors of per- and polyfluoroalkyl substances (PFAS) serum levels among members of a suburban US volunteer fire department," Int. J. Environ. Res. Public Health 18 (2021).; Paul E. Rosenfeld, et al., "Perfluoroalkyl substances exposure in firefighters: sources and implications," Environ. Res. 220 (2022); Graham F. Peaslee, et al., "Another Pathway for Firefighter Exposure to Per- and polyfluoroalkyl Substances: Firefighter Textiles", Environmental Science & Technology Letters 2020 7 (8), 594-599 DOI: 10.1021/acs.estlett.0c00410.

[3] Fire Fighter Cancer Awareness Month, International Association of Fire Fighters https://www.iaff.org/cancer-awareness-month/.

Safety Components Fabric Technologies, Inc.; StedFast USA, Inc.; and Southern Mills Inc. d/b/a TenCate Protective Fabrics (collectively, "Defendants") have collectively engaged in the conduct of trade and commerce in order to manufacture, distribute, market, offer for sale, and sell firefighter Turnout Gear to Plaintiff and all other similarly situated Class members.

9. Plaintiff brings this action on behalf of itself and all other Class members similarly situated against Defendants who collectively manufactured, put in the stream of commerce, distributed, marketed, and sold to Plaintiff and Class members Turnout Gear treated and contaminated with PFAS chemicals.

10. Defendants are collectively responsible for the manufacture, distribution, marketing, offering for sale and sale of firefighting Turnout Gear that was manufactured and/or contaminated with PFAS chemicals and compounds.

11. The Turnout Gear was treated and/or contaminated with these fluorinated compounds in order to imbue the Turnout Gear with water-repellent and heat-resistive characteristics.

12. Generally accepted peer-reviewed scientific research and testing by both private and public authorities have demonstrated that Turnout Gear treated or contaminated with PFAS results in firefighters and others being exposed to the PFAS chemicals through dermal absorption, inhalation, and ingestion from the intended and expected use, cleaning, and storage of the gear.

13. Extensive scientific research and studies have demonstrated that PFAS exposure through dermal absorption, inhalation, and ingestion from the intended and

expected use, cleaning, and storage of Turnout Gear presented and continues to present a substantial risk of injury to the health and safety of the firefighters so exposed, including the risk of contracting cancer and other serious diseases.[4]

14. Throughout all times relevant to this matter, Defendants knew the PFAS-treated and/or contaminated Turnout Gear posed a serious risk of injury to the health and safety of firefighters and others so exposed.

15. Despite their knowledge, Defendants concealed what they knew and affirmatively misrepresented the risk of injury to potential purchasers and users of the goods, such as Plaintiff and Class members.

16. Defendants manufactured, distributed, marketed, offered for sale, and sold the goods to Plaintiff and Class members without adequate disclosure or warnings.

17. The Turnout Gear manufactured, distributed, marketed, offered for sale, and sold to Plaintiff and Class members by Defendants was not of merchantable quality; was not fit for its intended purpose; was unreasonably dangerous; and, was manufactured, distributed, marketed, offered for sale, and sold in an unfair and deceptive manner.

18. Defendants' conduct has resulted in Plaintiff and the other similarly-situated Class members purchasing and providing to their firefighter personnel Turnout Gear unfit for its ordinary and intended purpose that poses an unreasonable risk of injury to the health and safety of both 1) the firefighters and others so exposed due to dermal

[4] Nur-Us-Shafa Mazumder, et al., "Firefighters' exposure to per-and polyfluoroalkyl substances (PFAS) as an occupational hazard: A review," Front Matter 2023;10: doi10.3389/fmats.2023.1143411 (Author manuscript at PMC 2023 Dec. 06.); *See supra*, note 3.

exposure, inhalation, and ingestion of PFAS from wearing and using the Turnout Gear and 2) the firefighters and others exposed to toxic fumes, dust and particles from the storage, cleaning and presence of the PFAS-contaminated Turnout Gear in the fire station premises.

19. Plaintiff brings this action against Defendants on behalf of itself and all other similarly situated entities in the various states of the United States of America who purchased Turnout Gear that was manufactured, designed, or sold, in whole or in part, by any of the Defendants during the Class Period.

20. Plaintiff, on behalf of itself and all other similarly situated entities, request Class-wide relief that includes requiring Defendants to provide the funds necessary to:

a) Remove and properly dispose of the PFAS-treated and/or contaminated Turnout Gear Defendants manufactured, distributed, marketed, offered for sale, and sold to Plaintiff and other Class members; and

b) Compensate Plaintiff and other Class members for the cost of providing each of their firefighters at least two sets of Turnout Gear that meets NFPA standards, is not treated with or contaminated by PFAS, and does not contain PFAS.

## II. PARTIES

21. Plaintiff City of Revere, Massachusetts, is a municipal corporation. It owns, funds, and operates the Revere Fire Department, which operates 5 fire stations and is staffed by approximately 123 firefighters. The Revere Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the

Morning Pride brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear.

22. Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States. 3M has its principal place of business in St. Paul, Minnesota. 3M manufactures the PFAS chemicals that are the subject of this action.

23. Defendant EIDP, Inc. ("Old DuPont"), formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States. Old DuPont has its principal place of business in Wilmington, Delaware. Old DuPont manufactures the PFAS chemicals that are the subject of this action.

24. Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation that does business throughout the United States. New DuPont has its principal place of business in Wilmington, Delaware. New DuPont manufactures the PFAS chemicals that are the subject of this action.

25. Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States. Chemours has its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of the PFAS chemicals that are the subject of this action.

26. Defendant The Chemours Company, FC, LLC ("Chemours FC") is a Delaware corporation that does business throughout the United States. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures the PFAS chemicals that are the subject of this action.

27. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States. Corteva has its principal place of business in Wilmington, Delaware. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of the PFAS chemicals that are the subject of this action.

28. This Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., the Chemours Company, the Chemours Company FC, LLC, and Corteva, Inc. collectively, as "DuPont."

29. Defendant Elevate Textiles, Inc. ("Elevate Textiles") is a Delaware corporation that does business throughout the United States. Elevate Textiles has its principal place of business in Charlotte, North Carolina. Elevate Textiles is the corporate parent of Defendant Safety Components Fabric Technologies, Inc. Elevate Textiles manufactures textiles with the PFAS chemicals that are the subject of this action.

30. Defendant Fire-Dex GW, LLC ("Fire-Dex") is an Ohio limited liability company that does business throughout the United States. Fire-Dex has its principal place of business in Medina, Ohio. Fire-Dex manufactures Turnout Gear with the PFAS chemicals that are the subject of this action.

31. Defendant Gentex Corporation ("Gentex") is a Pennsylvania corporation that does business throughout the United States. Gentex has its principal place of business in Simpson, Pennsylvania. Gentex manufactures textiles with the PFAS chemicals that are the subject of this action.

32. Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States. Globe has its principal place of business in Pittsfield, New Hampshire. Globe manufactures Turnout Gear with the PFAS chemicals that are the subject of this action.

33. Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation that does business throughout the United States. Gore has its principal place of business in Newark, Delaware. Gore manufactures textiles with the PFAS chemicals that are the subject of this action.

34. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States. Honeywell has its principal place of business in Charlotte, North Carolina. Until at least May 22, 2025, Honeywell manufactured Turnout Gear with the PFAS chemicals that are the subject of this action. One of the brand names that Honeywell manufactured until at least May 22, 2025 was the "Morning Pride" brand of Turnout Gear.

35. Defendant The InterTech Group, Inc. ("InterTech") is a South Carolina corporation that does business throughout the United States. InterTech has its principal place of business in North Charleston, South Carolina. InterTech is the corporate parent of Defendant PBI Performance Products, Inc. InterTech manufactures textiles with the PFAS chemicals that are the subject of this action.

36. Defendant Lion Group, Inc. ("Lion") is an Ohio corporation that does business throughout the United States. Lion has its principal place of business in Dayton, Ohio. Lion manufactures Turnout Gear with the PFAS chemicals that are the subject of this action.

37. Defendant Milliken & Company ("Milliken") is a Delaware corporation that does business throughout the United States. Milliken has its principal place of business in Spartanburg, South Carolina. Milliken manufactures textiles with the PFAS chemicals that are the subject of this action.

38. Defendant Morning Pride Manufacturing L.L.C. ("Morning Pride") is a Delaware limited liability company that does business throughout the United States. Morning Pride has its principal place of business in Dayton, Ohio. Morning Pride does business under the name "Honeywell First Responder Products" and manufactures Turnout Gear with the PFAS chemicals that are the subject of this action.

39. Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation that does business throughout the United States. PBI has its principal place of business in Charlotte, North Carolina. PBI is a wholly owned subsidiary of Defendant

InterTech. PBI manufactures textiles with the PFAS chemicals that are the subject of this action.

40. Defendant Safety Components Fabric Technologies, Inc. ("Safety Components") is a Delaware corporation that does business throughout the United States. Safety Components has its principal place of business in Greenville, South Carolina. Safety Components is a subsidiary of Defendant Elevate Textiles. Safety Components manufactures textiles with the PFAS chemicals that are the subject of this action.

41. Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast manufactures textiles with the PFAS chemicals that are the subject of this action.

42. Defendant Southern Mills Inc. d/b/a TenCate Protective Fabrics ("TenCate") is a Georgia corporation that does business throughout the United States. TenCate has its principal place of business in Senoia, Georgia. TenCate manufactures textiles with the PFAS chemicals that are the subject of this action.

43. Plaintiff alleges that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiff and members of the Class, as alleged herein.

44. Plaintiff alleges that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subject of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed,

advertised, distributed, and/or sold the equipment, materials, and/or chemicals throughout the United States and caused harm to Plaintiff and members of the Class.

45. Defendants expected, or should have expected, their actions to have consequences throughout the United States.

46. Defendants purposefully availed themselves of the privilege of conducting activities in the United States, thus invoking the benefits and protections of its laws.

## III. JURISDICTION AND VENUE

47. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and most members of the proposed Class are citizens of a state different from each Defendant.

48. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because many of the actions giving rise to this Complaint took place within this District.

49. This Court has personal jurisdiction over Defendants because each Defendant has maintained substantial contacts and/or committed overt acts in furtherance of the conduct alleged in the Complaint throughout the United States. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business in the United States.

# IV. FACTUAL ALLEGATIONS

## A. Per- and Polyfluoroalkyl Substances

50. Per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals") are a class of thousands of synthetic chemical compounds consisting of chains of carbon and fluorine atoms that are highly resistant to being broken down in nature.

51. PFAS do not exist naturally in the environment.

52. PFAS were first developed in the 1930s and 1940s.

53. The chemical and thermal stability and water-repellent characteristics of PFAS have led to their use in a wide range of commercial products and industries.

54. The same qualities that cause PFAS to persist in the environment also cause them to persist in the human body for long (if not indefinite) periods of time, earning them the nickname "forever chemicals".

55. In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to absorb into and bioaccumulate in the human body.

56. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

57. Generally accepted peer-reviewed scientific research has cautioned that PFAS exposure, even in minute quantities, is considered hazardous to human health.

58. PFAS exposure in humans can occur via dermal absorption, as well as ingestion and inhalation. PFAS also spread through humans by crossing the placenta from mother to fetus and by passing to infants through breast milk.

59. When exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[5] increasing the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

60. PFAS exposure has been linked to multiple serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.[6]

61. PFAS have been found to concentrate in human blood, bones, and organs.

62. Presently, the vast majority of people in the United States are exposed to background levels of PFAS via drinking water, food, and other sources. However, certain populations have higher levels of PFAS exposure, including as an occupational hazard.

63. The thousands of PFAS in existence can be divided into two categories: non- polymeric and polymeric.

64. Thus far, most research has focused on the adverse effects of non-polymeric PFAS on human health rather than polymeric PFAS. Non-polymeric PFAS include the two most widely used PFAS Chemicals: Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS").

---

[5] A.S. Young, et al., "Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust," J. Expo. Sci. & Environ. Epidemiology 930-942 (2021).
[6] "Our Current Understanding of the Human Health & Environmental Risks of PFAS," EPA.gov (Last updated Nov. 26, 2024); C8 Science Panel Website www.c8sciencepanel.org (last visited May 12, 2025); *see supra*, note 3.

65. PFOA and PFOS bioaccumulate in humans' blood and organs, including the kidneys and liver.

66. PFOA and PFOS interfere with the human body's functions, including the functions of the organs and immune systems, leading to adverse health outcomes.

67. PFOA or PFOS exposure in any detectable amount is considered hazardous to human health.

68. The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and PFOS, many of which can manifest after years of exposure:

a. increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, lung cancer, blood related cancers, breast cancer, and ovarian cancer;

b. reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

c. interference with the body's natural hormones and liver enzymes;

d. changes in liver enzymes;

e. reproductive effects including decreased fertility;

f. developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

g. increased cholesterol levels and/or risk of obesity;

h. increased risk of high blood pressure or pre-eclampsia in pregnant women; and

i. interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

69. PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

70. PFOS has additionally been associated with increased incidences of potentially human-relevant tumors, including hepatocellular tumors in male and female rats and pancreatic islet cell carcinomas in male rats.

71. The United States Environmental Protection Agency ("EPA") has classified both PFOA and PFOS as likely human carcinogens.

72. The EPA has concluded that there is no safe level of PFOA or PFOS exposure to humans.

73. In 2022, the EPA initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act. In support of this Act, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

74. On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation establishing legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six PFAS in drinking water. The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals for the six PFAS, listing this level as "Zero" for both PFOA and PFOS.

75. The International Agency for Research on Cancer ("IARC") has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

76. The IARC has classified PFOS as "possibly carcinogenic to humans" based on strong evidence that it has some key properties of a carcinogen in people who are exposed to it and limited evidence that it can cause cancer in lab animals.

77. In 2022, the California Office of Environmental Health Hazard Assessment listed PFOA as a chemical known to the state of California to cause cancer.

78. While most research has focused on the adverse effects of non-polymeric PFAS on human health (e.g., PFOA and PFOS), the production, manufacturing, and use of polymeric PFAS is also hazardous to human health.[7]

79. Polymeric PFAS include fluoropolymers and side-chain fluorinated polymers.

80. Fluoropolymers include polytetrafluorethylene ("PTFE"), one of the most well-known and commonly used PFAS Chemicals.

81. The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

[7] Rainer Lohmann, et al., "Are Fluoropolymers Really of Low Concern for Human and Environmental Health and Separate from Other PFAS?" Environmental Science & Technology Vol. 54 Iss. 20 (Oct. 20, 2020).

82. When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

83. The use of side-chain fluorinated polymers in manufacturing and commercial products poses substantial risks to human health.

84. The use of side-chain fluorinated polymers in manufacturing and commercial products such as textiles can lead to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can contaminate and create serious health risks to humans and the environment.[8]

**B. PFAS-Treated Turnout Gear**

85. Turnout Gear is the personal protective equipment used by firefighters.

86. Turnout Gear includes several components, namely helmets, hoods, jackets, pants (with suspenders), boots, and gloves.

87. These components are made up of three layers: a durable water repellant outer shell, a middle moisture barrier, and an inner thermal liner closest to the wearer's skin.

88. The primary purpose of the outer shell is to protect the firefighter from direct flame.

89. The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and

---

[8] *Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers*, US EPA 40 CFR Part 723.

body heat to escape. Liquid resistance and vapor permeability are particularly important for the prevention of steam burns, which can occur if water and heat get trapped inside the Turnout Gear.

90. The primary purpose of the thermal liner is to protect the firefighter from ambient heat.

91. Peer-reviewed scientific research has confirmed that all three layers of the Turnout Gear contain PFAS.[9]

92. In a 2020 study[10] conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), Turnout Gear (specifically, jackets and pants) was collected from firefighters across the United States and tested. The study included Turnout Gear manufactured by Defendants Globe, Lion, and Honeywell, as well as Turnout Gear manufactured with specialty fabrics from Defendant Gore, over several production years.

93. In the Peaslee study, the researchers found significant quantities of PFAS in every layer of both new (still in the original packaging) and used Turnout Gear.

94. In "every textile sample tested," the researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in both the moisture barrier and outside shell layers.[11]

---

[9] Nur-Us-Shafa Mazumder, et al. *supra*, note 4.
[10] Graham F. Peaslee, et al., "Another Pathway for Firefighter Exposure to Per- and polyfluoroalkyl Substances: Firefighter Textiles", Environmental Science & Technology Letters 2020 7 (8), 594-599 DOI: 10.1021/acs.estlett.0c00410.
[11] *Id*.

95. The Turnout Gear also contained significant levels of PFAS Chemicals including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFBS, 6:2 FTS, and 8:2 FTS.

96. In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.

97. In all three layers of tested Turnout Gear, PFOA was present at alarmingly high levels—for instance, in one set of gear that was tested, the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion.

98. To put these numbers into perspective, the EPA has set the MCL for PFOA in drinking water at 4 parts per trillion. The amount of PFOA present in the Turnout Gear that was tested was 182,000 parts per trillion (182 parts per billion) in the outer shell and 78,000 parts per trillion (78 parts per billion) in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[12]

99. "Startingly, a garment-to-hand transfer of total fluorine [] was also observed when researchers simply manipulated the textiles in our laboratory," which is an observation that strongly supports the premise that side-chain fluoropolymers and the PFAS they bind do release to the environment upon wear.[13]

---

[12] *Id.*

[13] *Id.*

100. Lead researcher Graham Peaslee commented that firefighter Turnout Gear is composed of "the most highly fluorinated textiles [he had] ever seen"[14] and that the levels of PFAS in the Turnout Gear means that the firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high…"[15]

101. Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters with dermal absorption through direct contact between the firefighters' skin and Turnout Gear being "a key exposure route."[16]

**C. Occupational Risk of Injury to Firefighters**

102. Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[17]

103. Today, occupational cancer is the leading cause of line-of-duty death in the fire service today.[18]

104. From 2015 to 2020, 75% of the firefighters added to the IAFF Fallen Fire Fighter Memorial died from occupational cancer.

---

[14] Raleigh McElvery, Protective Gear Could Expose Firefighters to PFAS, CHEMICAL AND ENGINEERING NEWS (July 1, 2020).
[15] Andrew Wallender, Firefighters Face New Possible Risk From Toxic PFAS: Their Gear, BLOOMBERG LAW (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.
[16] G.E. Campbell, et al., "PFAS-free Moisture Barriers in Structural Firefighting Gear, in Toward a PFAS-free Future: Safer Alternatives to Forever Chemicals," Royal Society of Chemistry Green Chemistry Series No. 81 (Nov. 17, 2023).
[17] *Id.*
[18] Peaslee, *supra* note 6.

105. Seventy percent of firefighters are predicted to die eventually from cancer, which is significantly higher than the general population.[19]

106. There are established links between PFOA and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that firefighters contract at a higher rate than the general public.[20]

107. In recent years, the composition of turnout gear has been scrutinized by researchers, firefighter interest groups, and government officials due to the adverse effects of PFAS on human health. In 2024, the states of Massachusetts and Connecticut passed a law (1) requiring notice beginning in 2025 to any person, local government, or state agency about whether PFAS is contained in firefighter Turnout Gear being sold in either state; and (2) banning the sale of any firefighter Turnout Gear containing PFAS beginning in January 1, 2027 in Massachusetts and 2028 in Connecticut.[21]

**D. Defendants' Contribution to PFAS-Containing Turnout Gear**

108. In 1938, a chemist employed by Defendant DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

109. By the 1950s, PFAS were widely used in commercial manufacturing, including by Defendants 3M and DuPont. Prior to the 1950s, PFAS had never been detected in the bodies or blood of humans.

---

[19] *Id.*
[20] *Id.*
[21] Massachusetts General Laws, Chapter 182, Acts of 2024, "An Act Relative To The Reduction Of Certain Toxic Chemicals In Firefighter Personal Protective Equipment;" Connecticut Acts of 2024 Public Acts 24-59, An Act Concerning The Use Of PFAS In Certain Products.

110. Since the 1950s, 3M and DuPont have continued to manufacture, market, and sell PFAS.

111. In 1966, Defendant Globe began manufacturing, marketing, and selling Turnout Gear containing PFAS.

112. Since 1966, Globe has continued to manufacture, market, and sell Turnout Gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, InterTech, PBI, and TenCate and PFAS manufactured by Defendants 3M and/or DuPont.

113. In 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE which Gore commercialized.

114. In 1970, Defendant Lion began manufacturing, marketing, and selling Turnout Gear containing PFAS.

115. Since 1970, Lion has continued to manufacture, market, and sell Turnout Gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont and Gore and PFAS manufactured by Defendants 3M and/or DuPont.

116. In 1983, Defendant Fire-Dex began manufacturing, marketing, and selling Turnout Gear containing PFAS.

117. Since 1983, Fire-Dex has continued to manufacture, market, and sell Turnout Gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, PBI, Safety Components, StedFast, and TenCate and PFAS manufactured by Defendants 3M and/or DuPont.

118. In 2008, Defendant Honeywell acquired Norcross Safety Products LLC and began manufacturing, marketing, and selling Turnout Gear containing PFAS.

119. Since 2008, Honeywell has continued to manufacture, market, and sell Turnout Gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont, Gore, InterTech, Morning Pride, PBI, and StedFast and PFAS manufactured by Defendants 3M and/or DuPont.

120. In 2009, Defendant DuPont began the commercial development of a potential replacement for PFOA, another PFAS compound known as HFPO-DA, under the trademark name “GenX.” Studies have repeatedly shown that GenX is hazardous to human health; like other PFAS, GenX accumulates in human blood, may cause damage to the kidneys, liver, immune system, and reproductive organs, and may cause cancer.

121. In 2013, DuPont announced that it was planning to spin off its “performance chemicals business” into a new publicly traded company, which ultimately became Defendant Chemours.

122. In 2015, Chemours began manufacturing, marketing, and selling performance chemicals including PFAS.

123. Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals including PFAS.

124. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the Turnout Gear purchased by Plaintiff and Class members and worn by Plaintiff and Class members’ firefighters.

125. Defendants 3M and DuPont expected their PFAS to reach ultimate users like Plaintiff and the Class members' firefighters without substantial change in the condition in which the substances were designed and manufactured, and such substances did in fact reach Plaintiff and Class members' firefighters.

126. Defendants 3M, DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, Morning Pride, PBI, Safety Components, StedFast, and TenCate expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did in fact reach Plaintiff and Class members' firefighters.

127. Defendants Fire-Dex, Globe, Honeywell, and Lion expected their Turnout Gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did in fact reach Plaintiff and Class members' firefighters.

**E. Defendants' Harm to Plaintiff and Members of the Class**

128. Plaintiff provides fire protection and emergency medical services to a city of over 59,000 residents.

129. Plaintiff and Class members purchased Turnout Gear (including helmets, hoods, jackets, pants, boots, and gloves) designed, manufactured, marketed, distributed, and sold by Defendants Fire-Dex, Globe, Honeywell, Morning Pride, and/or Lion, which contained PFAS-contaminated materials supplied by Defendants 3M, DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, PBI, Safety Components, StedFast, and/or TenCate, as well as PFAS supplied by Defendants 3M and/or DuPont.

130. Defendants represented the Turnout Gear to be safe and suitable for use by Plaintiff and Class members.

131. Plaintiff and Class members relied on Defendants' representations that the Turnout Gear was safe and suitable for use by humans.

132. Plaintiff and Class members' firefighters routinely used and wore the Turnout Gear in the ordinary course of their duties as firefighters.

133. Plaintiff and Class members' firefighters routinely used and wore the Turnout Gear for training purposes and in responding to fire situations and other emergencies.

134. Plaintiff and Class members' firefighters routinely depended upon the Turnout Gear for protection from extreme heat, flames, and other hazards.

135. Plaintiff and Class members' firefighters routinely stored the Turnout Gear in the bunk rooms of fire departments, as well as in their homes and vehicles.

136. Plaintiff and Class members' firefighters often used the Turnout Gear for a period of several years without replacement.

137. Plaintiff and Class members' firefighters often washed the turnout gear at fire stations and in their homes along with their daily station uniforms and other clothing.

138. The Turnout Gear was made from PFAS, was treated with PFAS, and contained PFAS.

139. The Turnout Gear was embedded with significant concentrations of PFAS in all three layers, including the thermal liners where PFAS comes into direct contact with skin.

140. The Turnout Gear was manufactured with and contained PTFE. Whenever PTFE is present in Turnout Gear, other PFAS used in the PTFE-manufacturing process will generally be present and pose serious health risks to the wearer.[22]

141. The Turnout Gear was manufactured with and contained side-chain fluoropolymers.

142. The Turnout Gear was manufactured with and contained PFOA and PFOS.

143. The PFAS present in the Turnout Gear (including PFOA and PFOS) migrated from the Turnout Gear to Plaintiff and Class members' firefighters and to the environment, causing PFAS exposure and contamination.

144. Plaintiff and Class members' firefighters were exposed to the PFAS present in the Turnout Gear (including PFOA and PFOS) via dermal absorption.

145. Plaintiff and Class members' firefighters were exposed to the PFAS present in the Turnout Gear (including PFOA and PFOS) through ingestion and inhalation.

146. Plaintiff and Class members did not know, and in the exercise of reasonable diligence could not have known, that the Turnout Gear posed serious health risks when used, cleaned, and/or stored in the fire house as it was intended to be used, cleaned, and/or stored in the ordinary course of a firefighter's duties and in a foreseeable manner.

147. Plaintiff and Class members did not know, and in the exercise of reasonable diligence could not have known, that the Turnout Gear contained significant levels of PFAS and, specifically, PFOA and PFOS.

---

[22] D. J. Muensterman, et al., "Disposition of Fluorine on New Firefighter Turnout Gear," Environmental Science & Technology 974-983 (2022).

148. Plaintiff and Class members did not know, and in the exercise of reasonable diligence could not have known, that Plaintiff and Class members' firefighters, and others, routinely suffered exposure to PFAS, including specifically PFOA and PFOS, as a result of using cleaning, and storing the Turnout Gear.

149. The Turnout Gear did not contain any labeling information or warnings indicating that the Turnout Gear was manufactured with PFAS, treated with PFAS, or contained PFAS.

150. The Turnout Gear did not contain any labeling information or warnings indicating that it specifically contained or may contain PFOA or PFOS.

151. The Turnout Gear did not contain any labeling information or warnings regarding the health risks associated with exposure to PFAS.

152. The Turnout Gear did not contain any labeling information or warnings regarding the health risks associated with exposure to PFOA or PFOS through use, wearing, cleaning, and storing the Turnout Gear.

153. As a result of using, cleaning and storing the Turnout Gear, Plaintiff and Class members' firefighters and other personnel routinely suffered exposure to unsafe levels of PFAS, including PFOA and PFOS.

154. As a result of such exposure, it is likely that PFAS (including PFOA and PFOS) accumulated in the blood and bodily tissue of Plaintiff and Class members' firefighters and other personnel.

155. The Turnout Gear is not fit for its intended use by firefighters because it contained PFAS, including PFOA and PFOS.

156. The Turnout Gear could have been manufactured in a way that did not include the use of, treatment by, or contamination with PFAS.

157. As alleged below, Defendants knew about the dangers of PFAS.

158. Defendants also knew that the Turnout Gear contained PFAS.

159. Despite this knowledge, Defendants marketed, sold, and/or distributed the Turnout Gear to Plaintiff and Class members as fit for its intended use.

160. Plaintiff and Class members seek equitable and monetary damages requiring Defendants to (1) remove and safely disposal of the Turnout Gear Plaintiff and Class members purchased that was treated or contaminated with PFAS and (2) pay the costs to provide replacement Turnout Gear that does not contain PFAS, with two sets of gear for each firefighter employed by Plaintiff and the Class.

**F. Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS**

161. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

162. 3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

163. As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont) but were not publicized or shared with any regulatory agencies. Notably:

a. In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

b. In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

c. By the 1970s, 3M documented PFAS in fish and was aware that PFAS were hazardous to marine life.

d. In 1975, 3M learned that there was a "universal presence" of PFAS in human blood samples taken from across the United States.

e. In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

f. In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g. In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h. In 1979, an internal 3M report discussing the studies on PFOA and PFOS stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."[23]

[23] Sharon Lerner, 3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show, THE INTERCEPT (July 31, 2018).

i. In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[24]

j. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

k. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

l. In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

164. Section 8(e) of the Toxic Substances Control Act ("TSCA") requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in the TSCA since its enactment in 1976. See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

---

[24] *Id.*

165. Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

166. In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

167. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after it was cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

168. In 2022 and following a multi-year probe into 3M and DuPont, the state of California announced that it was suing both companies for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[25]

169. The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M's Chairman and Chief Executive Officer Mike Roman asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external

---

[25] California sues 3M, DuPont over toxic 'forever chemicals', CNN (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

regulatory and business landscape for those we serve."[26] In connection with the announcement, 3M maintained that "3M's products are safe for their intended uses."[27]

**G. Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS**

170. Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

171. DuPont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

172. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[28]

173. In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[29]

174. As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

a. In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of

---

[26] 3M to Exit PFAS Manufacturing by the End of 2025, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3Mto-Exit-PFAS-Manufacturing-by-the-End-of-2025.
[27] *Id.*
[28] Sharon Lerner, The Teflon Toxin: DuPont and the Chemistry of Deception, THE INTERCEPT (Aug. 11, 2015).
[29] *Id.*

experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.[30]

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

c. In 1978, DuPont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

d. By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[31]

e. In 1981, DuPont transferred women out of work assignments that had a potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

f. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community

[30] *Id.*
[31] *Id.*

from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[32]

g. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h. In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[33]

i. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included study finding an association between prostate cancer and exposure to PFOA.[34]

175. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested

[32] *Id*.
[33] Nathaniel Rich, The Lawyer Who Became DuPont's Worst Nightmare, THE NEW YORK TIMES MAGAZINE (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst- nightmare.html.
[34] Lerner, supra note 23.

in any measurements of PFOA in general population samples" 3M informed DuPont that the half-life of PFOA was "much longer" than animal studies showed.[35]

176. In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

177. In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
>
> …
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[36]

178. In 2005, the EPA reached a settlement with DuPont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement

---

[35] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[36] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

179. In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours.

180. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

181. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit… We look forward to vigorously defending our record of safety, health and environmental stewardship."[37]

**H. The Remaining Defendants' Knowledge of the Dangers of PFAS**

182. Beyond 3M and DuPont, the remaining Defendants knew or should have known of the dangers of PFAS.

[37] California sues 3M, DuPont over toxic 'forever chemicals,' supra note 20.

183. In fact, over the years, many of the remaining Defendants have publicly acknowledged—whether in consumer advertising, product promotion, lobbying efforts, litigation, or otherwise—their awareness of increasing medical, environmental, governmental, and public concern regarding PFAS use and exposure.

184. For example, in or around 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants. The City pinpointed Defendant Elevate Textiles as "its largest source of PFAS."[38] Thereafter, a settlement agreement required Elevate Textiles to install a closed-loop system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in some of its products by June 15, 2025.[39]

185. Defendant Fire-Dex recently defended an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by firefighters and/or their spouses alleging bodily injuries due to PFAS exposure.

186. Defendant Gore openly advertises that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to

---

[38] Lisa Org, Burlington will curb PFAS discharges, per legal settlement with Haw River Assembly, NC NEWSLINE (Aug. 2, 2023), https://ncnewsline.com/2023/08/02/burlington-will-curb-pfas-discharges-per-legal-settlement-withhaw-river-assembly/.
[39] *Id.*

broaden the understanding of [PFAS]."[40] For example, in efforts to garner support for its open, long-standing commercial use of PTFE, Gore asserts:

> The present paper brings together fluoropolymer toxicity data, human clinical data, and physical, chemical, thermal, and biological data for review and assessment to show that fluoropolymers satisfy widely accepted assessment criteria to be considered as "polymers of low concern" (PLC) and to show that fluoropolymers are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes.
>
> Scientists, regulators, and concerned communities often fall into one of two groups: one says all PFAS should be banned and the other says PFAS are so different that each must be evaluated, classified, and regulated individually. Barbara J. Henry, PhD, a toxicologist with [Gore], says there's a middle way forward if PFAS are grouped by their properties.[41]

187. Defendant Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Minnesota law banning all non-essential uses of PFAS in 11 product categories, which will take full effect in 2032.[42]

188. In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

---

[40] Gore's Commitment to Material Stewardship, GORE, https://www.gore.com/about/materials-stewardship (last visited May 8, 2025).
[41] *Id*.
[42] Deena Winter, Honeywell and other companies want exemptions to Amara's Law banning 'forever chemicals', MINNESOTA REFORMER (Mar. 12,2024), https://minnesotareformer.com/2024/03/12/honeywell-and-other-companies-want-exemptions-to-amaras-law-banning-forever-chemicals/.

189. As of May 30, 2025, Defendant Morning Pride finally added a notice that its Turnout Gear contained PFAS in compliance with Chapter 111 of the Massachusetts State Law requiring a manufacturer or other person that sells firefighting personal protective equipment to provide written notice if the equipment contains intentionally added PFAS chemicals.[43]

190. Morning Pride now boasts that it offers "PFAS-free turnout gear systems that maintain the protection, durability, and comfort firefighters expect."[44]




191. In or around 2021, Defendant StedFast's spokesperson Mike Salvato presented on the topic of PFAS, PFOS, PFOA, and PTFE in Turnout Gear, acknowledging that "PFOS and PFOA have been found to be 'potentially harmful,'" but arguing that "[i]t is important to consider the trade-off of performance with perceived health risk if eliminating PFAS in gar." Salvato acknowledged that the "Peaslee study shows that turnout gear may 'shed' some PFAS" but argued "[o]rganizations should

[43] https://automation.honeywell.com/content/dam/honeywell-edam/sps/ppe/support/documents/complience/pip-hsp-massachusetts-pfas-notification.pdf.
[44] https://www.linkedin.com/posts/morningpride-pfasfree-firefightersafety-share-7496248356755746816-eQvX/.

properly put into perspective the assumed risk with PFAS in turnout gear with other risks fire fighters face … with the current materials available, PFAS is essential."

192. Moreover, in the early 2020s, as the toxic exposure risk from products containing PFAS became more generally known, all Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from a myriad of consumer products, including textiles. During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g., Johnson & Johnson and Oral-B), and textile manufacturing companies.

193. All Defendants knew or should have known that Turnout Gear containing PFAS posed a substantial risk of injury to the health and safety of firefighters such as Plaintiff and Class members' firefighters because it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

194. All Defendants knew or should have known that exposure to PFAS-contaminated materials and/or PFAS places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

195. All Defendants knew or should have known that the Turnout Gear and its components parts that were either treated with or contained PFAS Chemicals that they manufactured, distributed, marketed, offered for sale, or sold would be used in ways which exposed Plaintiff and Class members' firefighters to the toxic properties of PFAS through dermal absorption, inhalation, and ingestion.

**I. Defendants' Failure to Warn Plaintiff and Class Members of PFAS Risks**

196. As alleged above, Defendants knew or should have known that Turnout Gear containing PFAS was extremely dangerous to firefighters such as Plaintiff and Class members' firefighters in that it placed them at an increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants did not disclose to Plaintiff or Class members the full extent of the health risk or provide warnings to Plaintiff or Class members regarding the substantial risk of injury to firefighters posed by PFAS contaminated Turnout Gear.

197. Instead, Defendants continued to misrepresent the safety of Turnout Gear containing PFAS and engaged in campaigns aimed to misinform and lessen public and regulatory concern regarding the issue of PFAS in Turnout Gear products.

198. Defendant 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[45]

199. As for PFOA and PFOS, 3M maintained and publicly advertised that:

[45] Health, Safety & Environmental Stewardship, 3M, https://pfas.3m.com/health-safety-and-environmental stewardship (last visited June 17, 2024).

> Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition…While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions.[46]

200. Defendant New DuPont maintained and publicly advertised that:

> In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFO or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[47]

201. Defendant Chemours maintained and publicly advertised that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintained and publicly advertised that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[48]

---

[46] How Fluorochemistries Are Safely Used, 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used (last visited May 8, 2025).
[47] DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS), DUPONT, https://www.dupont.com/pfas.html (last visited May 8, 2025).
[48] Our Commitment to Responsible Chemistry, CHEMOURS, https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship (last visited May 8, 2025).

202. In 2017, Defendant Lion's President Stephen Schwartz wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's retraction of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish … [B]eacuase these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn- out gear. However, based on all available scientific data, such nominal trace amounts… would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.

…

> We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks…However, the elevated risks derives from the hazardous substances produced by the fire, not the turn out gear that protects firefighters.

203. In 2017, Lion launched its "NOT IN OUR HOUSE" initiative to "spread awareness of the cancer threat facing the fire service" and "educat[e] firefighters on the actions they can take to reduce their exposure to cancer-causing agents."

204. Since 2017, Lion's NOT IN OUR HOUSE initiative emphasized raising awareness of firefighters' exposure during fire situations to Polycyclic Aromatic Hydrocarbons ("PAHs"), naturally occurring carcinogens, likely in order to distract from the issue of firefighters' occupational exposure to PFAS.

205. In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action

especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

206. In 2019, Defendant Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non- polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

207. In 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, took out a full page in the publication Firefighter Nation to argue that Turnout Gear is completely safe and that any evidence to the contrary, including the Peaslee study, is unreliable fearmongering. Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population

…

> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

208. In 2021, Lion confirmed that the representations articulated by Chrostowski reflected the company's position.

209. In 2021, Defendant Gore maintained in a New York Times article that its Turnout Gear products were safe for wearers.

210. In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

211. Moreover, Defendants have repeatedly represented to Plaintiff, Class members, and the public that their products were safe for their intended uses, including the ways in which Plaintiff and Class members were expected to use, clean, and store the Turnout Gear.

212. For example, Defendant DuPont maintained and publicly advertised that Turnout Gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

213. Defendant Fire-Dex maintained and publicly advertised that its Turnout Gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its Turnout Gear products "key to keeping your crew safe!"

214. Defendant Globe maintained and publicly advertised that the company is "committed to firefighter health & safety," and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

215. Defendant Gore maintained and publicly advertised that the company's protective fabrics enable firefighters "to stay safe and engaged," emphasizing that to do their jobs, firefighters "need protective garments that keep them protected with a limited amount of physiological burden."

216. Defendant Honeywell maintained and publicly advertised that the company's "safety solutions protect the future of 500 million workers" and that its firefighter Turnout Gear is "[d]esigned to provide safety," referring to its Turnout Gear products as "the pioneer of safety by design."

217. Defendant Lion maintained and publicly advertised that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

218. Defendant StedFast maintained and publicly advertised that all of its products "are manufactured with safety in mind," asserting that "[k]eeping people safe is a core value of our business."

J. **Defendants' Failure to Provide Safety Warning on Product Labels**

219. As alleged above, the Turnout Gear purchased by Plaintiff and Class members did not contain appropriate labeling information or warnings including:

a. Indicating that the gear contained or may contain PFAS;

b. Indicating that the gear specifically contained or may specifically contain PFOA or PFOS;

c. Regarding the health risks associated with exposure to PFAS; or

d. Regarding the health risks associated with exposure to PFOA or PFOS.

220. Labels on Defendants' Turnout Gear did not adequately disclose that the Turnout Gear contained PFAS or PFAS-containing materials, and contained no adequate warning that handling, wearing, or using the Turnout Gear as it was intended to be handled, worn, cleaned, used or stored can result in exposure to PFAS and adverse effects to human health.

**K. Defendants' Ability to Design Safer Turnout Gear**

221. Despite Defendants' expressed position that PFAS was "essential" in Turnout Gear, at all relevant times, it was technologically and economically feasible to design and manufacture Turnout Gear that did not contain PFAS compounds.

222. In fact, Defendants had the knowledge and technical ability to design and manufacture PFAS-free chemicals and materials that could be incorporated into Turnout Gear to ensure that the Turnout Gear had appropriate durable water-repellent and heat-resistive characteristics to comply with the industry standards as embodied in NFPA standards.

223. In or around 2021, Defendant Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[49]

---

[49] Julia John, WL Gore to release PFAS-free waterproof material for apparel, ENHESA (Oct. 4, 2021).

224. In or around 2021, Defendant Fire-Dex's Vice President of Product Innovation and Strategy Todd Herring stated in a press release that the company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials…that meets the increasing market demand for PFAS free Turnout Gear material options."[50]

225. In or around 2021, Defendant Honeywell Senior Offering Manager for first responder gear Deana Stankowski spoke out about Honeywell's newly available PFAS-free outer shell layer "options," explaining: "We are making sure that we have every PFAS-free outer shell available in the market as part of our portfolio…We have customers field testing PFAS-free outer shells, and we will eventually transition over completely to PFAS free." Stankowski added:

> There's no reason to offer both options…Any minor tradeoffs with PFAS- free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way…The color fastness and wear remain the same.[51]

226. In or around 2022, a group of students at UC Berkley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in Turnout Gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that

---

[50] FIREHOUSE, *Fire-Dex Launches Non-Fluorinated PPE Fabrics*, (Feb. 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/fire-dex-fire-dex-launches-nonfluorinated-ppe-fabrics.
[51] Ronnie Wendt, Innovations in Turnout Gear, INDUSTRIAL FIRE WORLD (Mar. 17, 2021).

polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of firefighter Turnout Gear.

227. As of 2025 there is available in the marketplace PFAS-free Turnout Gear that complies with the water-repellent and heat-resistive characteristics and industry standards for firefighter Turnout Gear embodied in applicable NFPA standards.

**L. Defendants Failed to Disclose the Unfit Dangerous Nature of the Turnout Gear**

228. During the relevant time period Plaintiff and the Class members in the ordinary course of operations purchased for their firefighters Turnout Gear that contained PFAS Chemicals and/or included textiles or component parts treated or contaminated with PFAS Chemicals that Defendants manufactured, distributed, marketed, offered for sale, or sold to Plaintiff and the Class members.

229. At the time Plaintiff and Class members purchased such PFAS-treated or contaminated Turnout Gear, Defendants did not adequately disclose or warn Plaintiff or the Class members regarding the full extent of the PFAS treatment and/or contamination of the Turnout Gear; the full nature and extent of the substantial threat and risk of harm to the health and safety of the firefighters, and others posed by the use, cleaning, and storing of the PFAS treated and/or contaminated Turnout Gear; and did not adequately disclose to Plaintiff and the Class members that the Turnout Gear was not merchantable, was not fit for its intended use, was unreasonably dangerous to firefighters and others from its expected use, cleaning, and storing, and for this reason should not be purchased or otherwise acquired by Plaintiff or the Class members.

230. Defendants misrepresented through public statements and concealment of information known to them how unmerchantable, unfit, unsafe and/or unreasonably dangerous the Turnout Gear was for its intended use, expected cleaning, and storage because of PFAS treatment or contamination.

231. Defendants failed to inform Plaintiff and the Class members of the inherent danger and substantial risk to health and safety posed by the PFAS-treated and/or contaminated Turnout Gear, and of the risk of injury or harm to human health posed by the expected use, cleaning, and storage of the Turnout Gear.

232. In acting as alleged in this Complaint, Defendants deprived Plaintiff and the Class members of the information necessary for Plaintiff and Class members to make informed business decisions regarding purchasing Turnout Gear during the relevant time period and taking the reasonable and necessary steps to protect their firefighters and others exposed to the danger posed by the Turnout Gear resulting from expected use, cleaning and storage.

## V. CLASS ALLEGATIONS

233. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of itself and the following (the "Class"):

> All entities in the various states of the United States of America that have purchased firefighter Turnout Gear during the relevant time period that was treated or contaminated with PFAS resulting from Defendants' manufacturing, distribution, marketing, offering for sale or sales activity.

234. Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

235. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as m embers of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; € counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

236. **Ascertainability**. The proposed Class is readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the Class. Further, the members of the class can be readily identified though records and information in Defendants' possession, custody, or control.

237. **Numerosity**. The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are several thousand class members.

238. **Commonality** and **Predominance**. Common question of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a. Whether Defendants' collective conduct resulted in the availability in the marketplace of firefighter Turnout Gear that was unmerchantable; unfit for its intended purpose; and unreasonably dangerous for its intended and expected use, cleaning and storage;

b. Whether members of the Class suffered the same or substantially similar injury or damage namely: purchase of firefighter Turnout Gear that is unmerchantable; unfit for its intended purpose; and unreasonably dangerous for its intended and expected use, cleaning and storage;

c. Whether equity and law require that Defendants collectively share in the cost of the remedy namely: 1) retrieval, removal and proper disposal of PFAS-treated and/or contaminated Turnout Gear; and, 2) providing each Class member with sufficient funds to outfit each Class member's firefighters with two sets of PFAS-free Turnout Gear that meets the industry standards for such Turnout Gear in accordance with the applicable NFPA standards.

239. **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiff and Class members were directly caused by Defendants' wrongful conduct, and Plaintiff and Class members assert similar claims for relief.

240. **Adequacy**. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel has any interest adverse to those of the other members of the Class.

241. **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action is manageable. Plaintiff knows of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

**A. Tolling and Estoppel of Applicable Statute of Limitations**

242. Defendants had knowledge of the hazard to the health and safety of Plaintiff and Class members' firefighters caused by exposure to PFAS Chemicals for decades.

243. Beginning in the 1960s and continuing through the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

244. Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiff and Class members' firefighters by designing, manufacturing, and selling turnout gear that was treated or contaminated with PFAS.

245. Defendants intentionally concealed this information from Plaintiff, Class members, and the public.

246. Defendants intentionally and continuously misrepresented the safety of the Turnout Gear treated or contaminated with PFAS materials and assured Plaintiff and Class members, as well as the public and governmental authorities, that the PFAS-treated or contaminated Turnout Gear was safe for its intended and expected use, cleaning and storage.

247. At all relevant times, Defendants did not adequately disclose or warn Plaintiff and Class members of the true nature of the danger posed by PFAS-treated or contaminated firefighter Turnout Gear.

248. Neither Plaintiff nor Class members, through the exercise of reasonable care or due diligence, could have discovered the true nature of Defendants' products as alleged herein. Further, Plaintiff and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

249. For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff and Class members.

250. Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiff and Class members for decades.

251. Because of Defendants' active and ongoing concealment of the hazards of PFAS Chemicals, and the unique dangers posed to firefighters through dermal absorption, ingestion, and inhalation of PFAS Chemicals through off-gassing and migration, Plaintiff and the Class members could not have reasonably discovered the causes of action alleged herein.

252. For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiff or Class members should be tolled.

## VI. CLAIMS FOR RELIEF

### A. UNJUST ENRICHMENT

253. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-252 stated above.

254. Defendants' conduct induced Plaintiff and the Class members to purchase firefighter Turnout Gear treated and/or contaminated with PFAS and to bestow upon the Defendants the benefit of a financial transaction in which money was paid by Plaintiff and Class members. The transaction benefitted Defendants by legitimizing in the marketplace the contention that the Turnout Gear goods purchased were merchantable; fit for their intended purpose; and reasonably safe for their intended and expected use, cleaning and storage.

255. The financial and marketplace validation conferred on Defendants by the transaction at issue was not equitable or just because Plaintiff and Class members did not receive in exchange firefighter Turnout Gear that was merchantable; fit for its intended purpose; and, reasonably safe for its intended and expected use, cleaning and storage.

256. As a result of the transaction at issue, Plaintiff and Class members have been burdened by firefighter Turnout Gear that poses a substantial ongoing risk of serious injury to the firefighters who use the Turnout Gear and to firefighters and others who are exposed to the PFAS Chemicals from the use, cleaning and storage of the Turnout Gear in the ordinary course. This places on Plaintiff and the Class members a substantial financial and legal burden regarding possession of contaminated goods that create an ongoing danger to firefighters and others exposed to the use, cleaning and storage of the contaminated gear that can only be remedied by the safe removal and proper disposal of the unmerchantable, unfit and unsafe goods.

257. As a result of the transaction Plaintiff and Class members have expended substantial money and been deprived of budgeted funds for the purchase of firefighter Turnout Gear that is merchantable, fit for its intended purpose and reasonably safe for its intended and expected use, cleaning and storage. In this way, Defendants have inequitably and unjustly deprived Plaintiff and Class members with the financial means to outfit each and every firefighter with at least two sets of suitable Turnout Gear so that the firefighters can perform their duties in the ordinary course with one set of clean gear and one set either ready or being readied for subsequent use by appropriate cleaning.

258. Under these circumstances it is inequitable and unjust for Defendants to retain the financial and marketplace validation benefits of the transaction at issue and leave Plaintiff and the Class members burdened with: 1) non-merchantable, unfit, and unreasonably dangerous Turnout Gear whose danger can only be remedied by proper removal and disposal and 2) the lack of funds to purchase two sets of suitable Turnout Gear that is not treated or contaminated with toxic PFAS substances.

259. In order to remedy the inequitable and unjust circumstance at issue, it is necessary to require Defendants who unjustly profited and benefitted from the circumstance they created by their collective misconduct to collectively expend the resources to: 1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear and 2) outfit each of the Plaintiff's and Class members' firefighters with two sets of suitable firefighter Turnout Gear that has not been treated or contaminated with PFAS compounds.

**B. KNOWING CONCEALMENT & MISREPRESENTATION OF MATERIAL INFORMATION**

260. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-252 stated above.

261. During all times relevant to this action, Defendants were in possession of information that was material to the decision by Plaintiff and Class members to engage in the transaction at issue. This information concerned the fact that the firefighter Turnout Gear at issue was unmerchantable and unfit for the ordinary purposes for which such goods were used because it had been treated and contaminated with PFAS compounds,

which posed a significant risk of harm to the health and safety of the firefighters and others from the intended and expected use, cleaning and storage of the goods.

262. Despite possessing information that was material to the fitness of the goods for the ordinary purposes for which such goods were to be used, Defendants did not adequately disclose to and concealed the material information from Plaintiff and Class members prior to and/or at the time of the transaction.

263. Despite possessing information that was material to the fitness of the goods for the ordinary purposes for which such goods were to be used, Defendants affirmatively misrepresented to Plaintiff and the Class members that the goods at issue were fit for the ordinary purposes for which they were to be used prior to and at the time of the transaction at issue.

264. As a result of Defendants' knowing concealment and affirmative misrepresentation of material information regarding the fitness and suitability of the firefighting Turnout Gear at issue for the ordinary purposes for which such goods were to be used, Plaintiff and the Class members agreed to enter into the transaction at issue and purchase such goods.

265. As a result of Plaintiff's and the Class members' decision to enter into the transaction at issue and purchase the firefighting Turnout Gear at issue without the benefit of knowing the material information regarding the goods' fitness for the ordinary purposes for which such goods are used, Plaintiff and the Class members incurred monetary damages and legal obligations. The Plaintiff and Class members have been wrongly deprived of funds that were budgeted and expended to purchase suitable

firefighter Turnout Gear. In order to remedy the harm caused by Defendants' conduct, Plaintiff and Class members require additional resources necessary to: 1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and, 2) outfit each of the Plaintiff's and Class members' firefighters with two sets of suitable firefighter Turnout Gear that has not been treated or contaminated with PFAS compounds.

## C. BREACH OF UCC IMPLIED WARRANTIES

266. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-252 stated above.

### Applicable State Statutes Regarding Uniform Commercial Code §2-314 Unmerchantable Goods & §2-315 Unfitness for a Particular Purpose

267. The following statutes of the various states of the United States of America are applicable to Defendants' proffering firefighter Turnout Gear that was unmerchantable in violation of UCC §2-314 and unfit for the Turnout Gear's particular purpose in violation of UCC §2-315:

> **Alabama**: Ala. Code §§ 7-2-314, 7-2-315; **Alaska**: Alaska Stat. §§ 45.02.314, 45.02.315; **Arizona**: Ariz. Rev. Stat. §§ 47-2314, 47-2315; **Arkansas**: Ark. Code Ann. §§ 4-2-314, 4-2-315; **California**: West's Ann. Cal. Com. Code §§ 2314, 2315; **Colorado**: Colo. Rev. Stat. §§ 4-2-314, 4-2-315; **Connecticut**: Conn. Gen. Stat. §§ 42a-2-314, 42a-2-315; **District of Columbia**: D.C. Code §§ 28:2-314, 28:2-315; **Delaware**: Del. Code Ann. tit. 6, §§ 2-314, 2-315; **Illinois**: 810 Ill. Comp. Stat. 5/2-314, 5/2-315; **Indiana**: Ind. Code §§ 26-1-2-314, 26-1-2-315; **Iowa**: Iowa Code §§ 554.2314, 554.2315; **Kansas**: Kan. Stat. Ann. §§ 84-2-314,

84-2-315; **Kentucky**: Ky. Rev. Stat. Ann. §§ 355.2-314, 355.2-315; **Louisiana**: La. Civ. Code arts. 2520, 2524; **Maine**: 11 Me. Rev. Stat. §§ 2-314, 2-315; **Maryland**: Md. Code Ann., Com. Law §§ 2-314, 2-315; **Massachusetts**: Mass. Gen. Laws ch. 106, §§ 2-314, 2-315; **Michigan**: Mich. Comp. Laws §§ 440.2314, 440.2315; **Minnesota**: Minn. Stat. §§ 336.2-314, 336.2-315; **Mississippi**: Miss. Code Ann. §§ 75-2-314, 75-2-315; **Missouri**: Mo. Rev. Stat. §§ 400.2-314, 400.2-315; **Montana**: Mont. Code Ann. §§ 30-2-314, 30-2-315; **Nebraska**: Neb. U.C.C. §§ 2-314, 2-315; **Nevada**: Nev. Rev. Stat. §§ 104.2314, 104.2315; **New Hampshire**: N.H. Rev. Stat. Ann. §§ 382-A:2-314, 382-A:2-315; **New Jersey**: N.J. Stat. Ann. §§ 12A:2-314, 12A:2-315; **New Mexico**: N.M. Stat. Ann. §§ 55-2-314, 55-2-315; **New York**: N.Y. U.C.C. Law §§ 2-314, 2-315; **North Carolina**: N.C. Gen. Stat. §§ 25-2-314, 25-2-315; **North Dakota**: N.D. Cent. Code §§ 41-02-31, 41-02-32; **Ohio**: Ohio Rev. Code Ann. §§ 1302.27, 1302.28; **Oklahoma**: Okla. Stat. tit. 12A, §§ 2-314, 2-315; **Oregon**: Or. Rev. Stat. §§ 72.3140, 72.3150; **Pennsylvania**: 13 Pa. Cons. Stat. §§ 2314, 2315; **Rhode Island**: R.I. Gen. Laws §§ 6A-2-314, 6A-2-315; **South Carolina**: S.C. Code Ann. §§ 36-2-314, 36-2-315; **South Dakota**: S.D. Codified Laws §§ 57A-2-314, 57A-2-315; **Tennessee**: Tenn. Code Ann. §§ 47-2-314, 47-2-315; **Texas**: Tex. Bus. & Com. Code §§ 2.314, 2.315; **Utah**: Utah Code Ann. §§ 70A-2-314, 70A-2-315; **Vermont**: 9 Vt. Stat. Ann. §§ 2-314, 2-315; **Virginia**: Va. Code Ann. §§ 8.2-314, 8.2-315; **Washington**: Wash. Rev. Code §§ 62A.2-314, 62A.2-315;

**West Virginia**: W. Va. Code §§ 46-2-314, 46-2-315; **Wisconsin**: Wis. Stat. §§ 402.314, 402.315; **Wyoming**: Wyo. Stat. Ann. §§ 34.1-2-314, 34.1-2-315.

**(1). Breach of Warranty of Merchantability – UCC § 2-314**

268. The firefighter Turnout Gear that is the subject of this action was treated and/or contaminated with PFAS rendering the Turnout Gear not merchantable or fit for the ordinary purposes for which such Turnout Gear is used.

269. The PFAS treated and/or contaminated firefighter Turnout Gear was not suitable for use and posed a substantial risk of injury to the health and safety of firefighters and others exposed to the hazards of PFAS from the intended and expected use, cleaning and storage of the Turnout Gear.

270. At the time of the transaction at issue, the Defendants had reason to know of the general and particular requirements and needs of the Plaintiff and Class members regarding the firefighter Turnout Gear and that the harm resulting from Defendants' conduct as alleged could not reasonably have been prevented by Plaintiff and the Class members.

271. As a consequence of the Defendants' conduct as alleged, the Plaintiff and Class members have been wrongly deprived of funds that were budgeted and expended to purchase suitable firefighter Turnout Gear and must expend additional resources to: 1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and 2) outfit each of the Plaintiff's and Class members' firefighters with two sets of suitable

firefighter Turnout Gear that has not been treated or contaminated with PFAS compounds.

**(2). Breach of Warranty Fitness for Particular Purpose –UCC § 2-315**

272. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-252 stated above.

273. The firefighter Turnout Gear that is the subject of this action was treated and/or contaminated with PFAS rendering the Turnout Gear unfit for the particular purpose for which such Turnout Gear is used and posing a substantial risk to the health and safety of firefighters and others exposed to the hazards of PFAS from the intended and expected use, cleaning and storage of the Turnout Gear.

274. At the time of the transaction at issue, the Defendants had reason to know of the particular purpose for which the firefighter Turnout Gear was required and that Plaintiff and Class members were relying on Defendants' skill, judgment, particular knowledge regarding the goods at issue. In addition, Defendants knew of the harm to Plaintiff and Class members that likely would result from Defendants' conduct as alleged at the time of the transaction at issue.

275. As a consequence of the Defendants' conduct as alleged, in order for the Plaintiff and Class members to remedy the harm caused by Defendants' conduct as alleged it will be necessary for Plaintiff and the Class members to expend the resources necessary to: 1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and, 2) outfit each of the Plaintiff's and Class members' firefighters with

two sets of suitable firefighter Turnout Gear that has not been treated or contaminated with PFAS compounds.

276. As a consequence of the Defendants' conduct as alleged, the Plaintiff and Class members have been wrongly deprived of funds that were budgeted and must expend additional resources to: 1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and, 2) outfit each of the Plaintiff's and Class members' firefighters with two sets of suitable firefighter Turnout Gear that has not been treated or contaminated with PFAS compounds.

**D. UNFAIR & DECEPTIVE BUSINESS ACTS OR PRACTICES DECLARED TO BE UNLAWFUL**

277. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-252 stated above.

**Applicable State Statutes Regarding Unfair & Deceptive Acts or Practices in the Conduct of Business**

278. The following statutes of the various states of the United States of America are applicable to Defendants' engagement in acts or practices in the conduct of business declared to be unlawful:

**Alabama**: Ala. Code §§ 7-2-314, 7-2-315; **Alaska**: Alaska Stat. §§ 45.02.314, 45.02.315; **Arizona**: Ariz. Rev. Stat. §§ 47-2314, 47-2315; **Arkansas**: Ark. Code Ann. §§ 4-2-314, 4-2-315; **California**: West's Ann. Cal. Com. Code §§ 2314, 2315; **Colorado**: Colo. Rev. Stat. §§ 4-2-314, 4-2-315; **Connecticut**: Conn. Gen. Stat. §§ 42a-2-314, 42a-2-315; **District of Columbia**: D.C. Code §§ 28:2-314, 28:2-315; **Delaware**: Del. Code Ann. tit. 6, §§ 2-314, 2-315; **Illinois**: 810 Ill.

Comp. Stat. 5/2-314, 5/2-315; **Indiana**: Ind. Code §§ 26-1-2-314, 26-1-2-315; **Iowa**: Iowa Code §§ 554.2314, 554.2315; **Kansas**: Kan. Stat. Ann. §§ 84-2-314, 84-2-315; **Kentucky**: Ky. Rev. Stat. Ann. §§ 355.2-314, 355.2-315; **Louisiana**: La. Civ. Code arts. 2520, 2524; **Maine**: 11 Me. Rev. Stat. §§ 2-314, 2-315; **Maryland**: Md. Code Ann., Com. Law §§ 2-314, 2-315; **Massachusetts**: Mass. Gen. Laws ch. 106, §§ 2-314, 2-315; **Michigan**: Mich. Comp. Laws §§ 440.2314, 440.2315; **Minnesota**: Minn. Stat. §§ 336.2-314, 336.2-315; **Mississippi**: Miss. Code Ann. §§ 75-2-314, 75-2-315; **Missouri**: Mo. Rev. Stat. §§ 400.2-314, 400.2-315; **Montana**: Mont. Code Ann. §§ 30-2-314, 30-2-315; **Nebraska**: Neb. U.C.C. §§ 2-314, 2-315; **Nevada**: Nev. Rev. Stat. §§ 104.2314, 104.2315; **New Hampshire**: N.H. Rev. Stat. Ann. §§ 382-A:2-314, 382-A:2-315; **New Jersey**: N.J. Stat. Ann. §§ 12A:2-314, 12A:2-315; **New Mexico**: N.M. Stat. Ann. §§ 55-2-314, 55-2-315; **New York**: N.Y. U.C.C. Law §§ 2-314, 2-315; **North Carolina**: N.C. Gen. Stat. §§ 25-2-314, 25-2-315; **North Dakota**: N.D. Cent. Code §§ 41-02-31, 41-02-32; **Ohio**: Ohio Rev. Code Ann. §§ 1302.27, 1302.28; **Oklahoma**: Okla. Stat. tit. 12A, §§ 2-314, 2-315; **Oregon**: Or. Rev. Stat. §§ 72.3140, 72.3150; **Pennsylvania**: 13 Pa. Cons. Stat. §§ 2314, 2315; **Rhode Island**: R.I. Gen. Laws §§ 6A-2-314, 6A-2-315; **South Carolina**: S.C. Code Ann. §§ 36-2-314, 36-2-315; **South Dakota**: S.D. Codified Laws §§ 57A-2-314, 57A-2-315; **Tennessee**: Tenn. Code Ann. §§ 47-2-314, 47-2-315; **Texas**: Tex. Bus. & Com. Code §§ 2.314, 2.315; **Utah**: Utah Code Ann. §§ 70A-2-314, 70A-2-315; **Vermont**: 9 Vt. Stat. Ann. §§ 2-314, 2-315; **Virginia**: Va. Code Ann.

§§ 8.2-314, 8.2-315; **Washington**: Wash. Rev. Code §§ 62A.2-314, 62A.2-315; **West Virginia**: W. Va. Code §§ 46-2-314, 46-2-315; **Wisconsin**: Wis. Stat. §§ 402.314, 402.315; **Wyoming**: Wyo. Stat. Ann. §§ 34.1-2-314, 34.1-2-315.

**Defendants' Conduct Constitutes Unfair & Deceptive Acts and Practices Declared to be Unlawful in the Conduct of Business**

279. Defendants' conduct at issue constitutes unfair and deceptive acts and practices in the conduct of trade and commerce in violation of the statutes against the use of unfair or deceptive acts or practices in the conduct of business of the various states of the United States of America.

280. Plaintiff and the Class suffered a loss of money and property as a result of the Defendants use and employment in trade and commerce of unfair and deceptive acts and practices declared unlawful by the statutes against the use of unfair or deceptive acts or practices in the conduct of business of the various states of the United States of America.

281. As a result of Defendants' use and employment of unfair and deceptive acts and practices as alleged, Plaintiff incurred loss of money and property from expending budgeted funds to equip its firefighters with what Defendants misrepresented to Plaintiff was suitable firefighting Turnout Gear that comported with industry standards as detailed in NFPA standards. In addition, as a result of Defendants' conduct as alleged, Plaintiff has been burdened with the financial and legal obligation to remove and properly dispose of firefighter Turnout Gear treated and contaminated with PFAS compounds rendering the goods unmerchantable; unfit for their particular purpose; and unreasonably dangerous for

the intended and expected use, cleaning and storage. Further, as a result of Defendants' conduct as alleged Plaintiff has been unfairly burdened by the obligation to replace the unfit Turnout Gear with two sets of Turnout Gear per each of its firefighters that has not been treated or contaminated with PFAS compounds.

282. Defendants' use and employment of unfair and deceptive acts and practices as alleged has caused similar injury to numerous other entities of the various states of the United States of America that are similarly situated as Plaintiff.

283. Plaintiff adequately and fairly represents such other similarly situated entities.

284. Defendants' use and employment of the unfair and deceptive acts and practices alleged was a knowing and willful violation of the statute.

**E. NEGLIGENCE**

285. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-252 stated above.

286. At all times material hereto Defendants had a duty to provide a product fit for its intended use and to safety standards available in the market. This encompasses a duty to ensure Turnout Gear was free of PFAS.

287. Alternative materials are and were available to produce Turnout Gear equipment.

288. Notwithstanding this duty, Defendants were negligent and breached their duty of care in producing Turnout Gear containing PFAS.

289. As a direct and proximate result of Defendants' negligence, Plaintiff and Class members suffered damages as they have incurred costs associated with purchasing the PFAS-containing Turnout Gear and will incur addition costs in replacing the PFAS-containing Turnout Gear.

## VII. REQUEST FOR RELIEF

For these reasons, Plaintiff, on behalf of itself and the members of the Class, respectfully requests the Court upon proper adjudication of the claims, enter the following equitable and monetary relief:

A. Certification of the proposed Class;

B. Appointment of the undersigned counsel for the proposed Class;

C. Judgment requiring Defendants to expend the necessary funds to properly remove and dispose of the firefighter Turnout Gear purchased by Plaintiff and the Class members, during the relevant time period, as a result of the conduct alleged herein;

D. Judgment requiring Defendants to provide the funds necessary for Plaintiff and the Class members to outfit each of their respective firefighters with two sets of suitable Turnout Gear that has not been treated and/or contaminated with PFAS compounds and that complies with industry standards as detailed in NFPA standards;

E. Exemplary damages as provided by law for the Defendants' knowing and willful violation of the statutes prohibiting the use of unfair and deceptive acts and practices in the various states of the United States of America;

F. Attorneys' fees and costs as provided by law of the various states of the United

States of America;

G. Such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff on behalf of itself and all other Class members similarly situated demands a trial by jury as to all issues triable as of right.

Dated: October 19, 2026

Respectfully Submitted,

By: /s/ Daniel E. Gustafson
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Daniel J. Nordin (#392393)
Lydia E. Lockwood (#505659)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Email: dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
llockwood@gustafsongluek.com

**SAVERI LAW FIRM, LLP**
Joseph R. Saveri (CA Bar No. 130064)
(*pro hac vice* application forthcoming)
Cadio Zirpoli (CA Bar No. 179108)
(*pro hac vice* application forthcoming)
Regina Wang (CA Bar No. 326262)
(*pro hac vice* application forthcoming)
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
rwang@saverilawfirm.com

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown, Esq.
(*pro hac vice* application forthcoming)
Kevin F. Mulvey, Esq.
(*pro hac vice* application forthcoming)
134 Mineola Blvd., 2nd Floor
Mineola, NY 11514
(516) 873-9550

*Counsel for Plaintiff*